No. 25-3287

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

MICHAEL SMITH,

Plaintiff-Appellant

v.

FLOCK GROUP, INC.

Defendant-Appellee

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
No. 5:23-cv-2198-BYP

———————————

BRIEF FOR AMICI CURIAE
THE RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
AND THE INNOCENCE PROJECT IN PARTIAL SUPPORT OF PLAINTIFF

———————————

ELLEN NOBLE
Roderick & Solange
MacArthur Justice Center
501 H Street NW, Suite 275
Washington, DC 20002
(202) 869-3439
ellen.noble@macarthurjustice.org

JONATHAN MANES
Roderick & Solange
MacArthur Justice Center
160 E. Grand Avenue, 6th Floor
Chicago, IL 60611
(312) 503-0012
jonathan.manes@macarthurjustice.org

MAITHREYI NANDAGOPALAN
Innocence Project
40 Worth Street, Suite 701
New York, NY 10013
(212) 364-5340
mnandagopalan@innocenceproject.org

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 25-3287            Case Name: Michael Smith v. Flock Group, Inc.

Name of counsel:  Ellen Noble

Pursuant to 6th Cir. R. 26.1, Roderick & Solange MacArthur Justice Center as amicus curiae
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

> No

CERTIFICATE OF SERVICE

I certify that on _____ July 30, 2025 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Ellen Noble

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3287              Case Name: Michael Smith v. Flock Group, Inc.

Name of counsel: Ellen Noble

Pursuant to 6th Cir. R. 26.1, Innocence Project, Inc. as amicus curiae
Name of Party

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ July 30, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Ellen Noble

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

AMICI STATEMENTS OF INTEREST ................................................. 1

SUMMARY OF THE ARGUMENT ....................................................... 2

ARGUMENT ...................................................................................... 3

   I.   In assessing Mr. Smith's section 1983 claims, the Court should not conflate the state action inquiry with the causation inquiry. .......................................... 3

  II.  In assessing the state action prong of Mr. Smith's section 1983 claim, the district court substantially understated the extent of Flock's relationship with public law enforcement. ......................................................... 8

      A.  Flock's products are specifically designed for and marketed to law enforcement. ........................................................................ 10

      B.  Flock collects an extensive trove of information for law enforcement use. .................................................................................... 12

      C.  In its platform for cross-agency data-sharing, Flock operates a national law enforcement database akin to similar federal databases. ................ 15

      D.  Flock actively directs police operations on the streets and is functionally indistinguishable from traditional police dispatch or real-time text and radio bulletins. ........................................... 18

CONCLUSION ................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350 (9th Cir. 1981)........................7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................................8, 9

*Carl v. Muskegon Cnty.*, 763 F.3d 592 (6th Cir. 2014) ...............................................5

*Carpenter v. United States*, 585 U.S. 296 (2018) .....................................................17

*Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003)...............................................8

*Commonwealth v. Bell*, 113 Va. Cir. 316, 2024 WL 5516362 (Va. Cir. Ct. May 10, 2024) (unpublished) ...............................................................................................16

*Ensor v. Rust Eng'g Co.*, 935 F.2d 269 (Table), 1991 WL 93188 (6th Cir. 1991) ...7

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ...............................................6, 8

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592 (6th Cir. 2007).......4, 6

*Schmidt v. City of Norfolk*, No. 2:24-CV-621, 2025 WL 410080 (E.D. Va. Feb. 5, 2025) ................................................................................................................ 17, 18

Smith v. Flock Safety, No. 5:23-CV-2198, 2024 WL 1619544 (N.D. Ohio Apr. 15, 2024) ................................................................................................... 4, 7, 8, 9

*Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608 (6th Cir. 2018)..................4

*United States v. Jones*, 565 U.S. 400 (2012) ..........................................................14

*Vistein v. American Registry of Radiologic Technologists*, 342 Fed. App'x 113 (6th Cir. 2009) ....................................................................................................................8

*Wagner v. Metro. Nashville Airport Auth.*, 772 F.2d 227 (6th Cir. 1985) ...............4

*Waters v. City of Morristown, TN*, 242 F.3d 353 (6th Cir. 2001) .............................3

## Statutes

42 U.S.C. § 1983 ................................................................................... 3, 6, 8

Cal. Veh. Code § 2413(b) (2011)..............................................................................14

Ga. Code Ann. § 35-1-22(b) (2024) .........................................................................14

Tenn. Code Ann. § 55-10-302(b) (2014)..................................................................14

## Other Authorities

Bureau of Just. Stat., *CODIS*, https://bjs.ojp.gov/glossary/codis ...........................17

Bureau of Just. Stat., *Integrated Automated Fingerprint Identification System (IAFIS)*, https://bjs.ojp.gov/glossary/integrated-automated-fingerprint-identification-system-iafis ....................................................................................17

Flock Safety, *A Public Safety Technology Ecosystem*, https://www.flocksafety.com/ ...............................................................................12

Flock Safety, *End User License Agreement*, https://www.flocksafety.com/legal/terms-and-conditions-eula...........................13

Flock Safety, *License Plate Readers (LPR)*, https://www.flocksafety.com/products/lpr-cameras ................................ 14, 15, 16

Flock Safety, *National LPR Network*, https://www.flocksafety.com/products/national-lpr-network.................. 11, 13, 16

Flock Safety, *Real-Time Policing*, https://www.flocksafety.com/use-case/real-time-policing....................................................................................................12

Joseph Cox, *License Plate Reader Company Flock Is Building a Massive People Lookup Tool, Leak Shows*, 404 Media (May 14, 2025), https://www.404media.co/license-plate-reader-company-flock-is-building-a-massive-people-lookup-tool-leak-shows/ ............................................................14

Lars Daniel, *Privacy Violated, Warrantless Surveillance Alleges Flock Safety Camera Lawsuit*, Forbes (Oct. 22, 2024), https://www.forbes.com/sites/larsdaniel/2024/10/22/warrantless-surveillance-federal-lawsuit-challenges-flock-safety-cameras/ .................................................12

Matt Burgess & Dhruv Mehrotra, *License Plate Readers Are Creating a US-Wide Database of More than Just Cars*, WIRED (Oct. 3, 2024), https://www.wired.com/story/license-plate-readers-political-signs-bumper-stickers/ .............................................................................................................15

Robert Wang, *Jackson Township installs 22 license plate-reading cameras*, Canton Repository (June 23, 2022), www.cantonrep.com/story/news/2022/06/23/jackson-township-installs-flock-security-license-plate-reading-cameras/7568022001/ ..........................................13

## AMICI STATEMENTS OF INTEREST[1]

The **Roderick and Solange MacArthur Justice Center ("RSMJC")** is a public interest law firm founded in 1985 by the family of J. Roderick MacArthur to advocate for human rights and social justice through litigation. RSMJC attorneys have played a key role in civil rights battles in areas including police accountability, the Fourth Amendment, and privatized police surveillance. In addition to direct representation on behalf of our clients, RSMJC frequently files amicus briefs related to these civil rights issues throughout the federal circuits and in state supreme courts.

The **Innocence Project, Inc.** ("IP") is a nonprofit organization whose principal mission is to free the innocent, prevent wrongful convictions, and create fair, compassionate, and equitable systems of justice for everyone. The IP performs research and advocates—in individual cases and through legislative and administrative initiatives—for changes in laws and procedures to reduce the risk of wrongful convictions. Because flawed, misleading, and non-transparent forensic science is a leading contributor to wrongful convictions, the IP also advocates for accountability and transparency around forensic science techniques and tools, including emerging forensic and investigative technologies.

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person, other than the amici, their members, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

In assessing Mr. Smith's section 1983 claim, the district court erred in two ways. First, it conflated two distinct prongs of a section 1983 claim in its analysis: the requirement of state action and the requirement that such action have caused the deprivation of the plaintiff's rights. Second, to the extent the district court needed to reach the state action question, it dramatically understated what the complaint alleged, and what readily available information shows, as to the extent of Flock's entanglement with government law enforcement agencies.

First, for a plaintiff to adequately plead a section 1983 claim, the plaintiff must allege facts sufficient to show, if true, (1) that the defendant's conduct was fairly attributable to the state and (2) that the defendant's conduct caused the plaintiff to be deprived of his or her constitutional rights. These are distinct, albeit often related, inquiries. Particularly where the defendant is a private entity alleged to be working in close collaboration with or on behalf of the state, the question of state action cannot be conflated with the question of causation. Here, however, the district court did conflate the two. Amici do not take a position on whether Mr. Smith was in fact deprived of his constitutional rights or whether Flock's conduct caused any deprivation. However, if this Court agrees with the district court that Mr. Smith did not adequately allege a deprivation of rights or causation by Flock, it need not and should not reach the question of whether Flock engaged in state action.

Second, if this Court does reach the question of state action, it should not repeat the district court's error of ignoring facts alleged in the complaint and readily evident from Flock's own advertising material and public statements—facts that demonstrate a close nexus between Flock and the police agencies involved here. Flock's product suite is specifically designed for public law enforcement agencies, who are its main customers and the main recipients of data Flock gathers. The scope of that data also far exceeds the single snapshot and match that the district court's limited assessment considered. Flock's large-scale, cross-agency data-sharing platform effectively creates the kind of nationwide database previously only associated with public law enforcement. And Flock can be integrated directly into on-the-ground policing operations in much the same manner as traditional police dispatch and other real-time communications with patrol officers. A proper analysis of whether Flock could plausibly be considered a state actor must take account of these factors.

## **ARGUMENT**

## I.    **In assessing Mr. Smith's section 1983 claims, the Court should not conflate the state action inquiry with the causation inquiry.**

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Waters v. City of Morristown, TN*, 242 F.3d 353, 358–59 (6th Cir. 2001). This requires that a plaintiff satisfy the

requirement of "state action," which is "conduct 'fairly attributable' to the State." *Wagner v. Metro. Nashville Airport Auth.*, 772 F.2d 227, 229 (6th Cir. 1985). A plaintiff must also establish that such conduct *caused* the deprivation of a constitutional right. *See Pineda v. Hamilton Cnty. Ohio*, 977 F.3d 483, 490–91 (6th Cir. 2020).

Whether a private defendant's conduct constitutes state action is a separate question from whether the defendant's conduct caused the plaintiff's constitutional injury. *See Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 614 (6th Cir. 2018) (recognizing lack of causation as a "separate flaw" from lack of state action); *see also Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 611 (6th Cir. 2007) (analyzing causation and state action for section 1983 claim separately).

But in the proceedings below, the district court conflated these two inquiries. The court relied on the lack of a causal relationship between Flock's conduct and Mr. Smith's traffic stop to justify a finding of no state action. According to the district court, Mr. Smith was trying to hold Flock liable as a state actor "by attributing actions to [Flock] that it did not perform." Memorandum of Opinion and Order, RE 38, Page ID # 1011. Instead of assessing whether actions Flock did perform—like scanning for a hotlisted vehicle using a system that captures billions of license plate images a month, connecting data from multiple police agencies, and dispatching police to investigate by sending an alert—constitute state action, the

4

district court focused on the fact that Flock "does not create the information on the 'Hot List'" that led to the inaccurate alert, and that after Flock reports a match "against information that law enforcement agencies have flagged for alert notification," Flock "has no further involvement." *Id.*

These facts regarding Flock's limited involvement in the events leading up to Mr. Smith's traffic stop speak to whether Flock is to blame for the traffic stop, not whether Flock's conduct constitutes state action. *Cf. Carl v. Muskegon Cnty.*, 763 F.3d 592, 597 (6th Cir. 2014) (explaining fact that defendant doctor's treatment of plaintiff was minimal and that others were responsible for overseeing plaintiff's medical care "speak[s] more directly to . . . the merits" of plaintiff's constitutional claims and "are of modest value in assessing [defendant's] status as a state actor").

The district court's failure to consider whether Flock's scanning-and-dispatching conduct could be attributed to the state is especially apparent if you imagine slightly different facts. Imagine, for example, that the unwarranted traffic stop was caused not by outdated information on the Hot List, but instead, by an error in Flock's matching system. The district court's analysis does not speak to whether Flock's scanning-and-dispatching system could, in that circumstance, constitute state action given the substantial nexus—the significant operational intertwinement—between Flock's scanning-and-dispatching system and day-to-day police operations. Nor did the court ever assess whether the state provides

5

"significant encouragement, either over or covert" for Flock to operate the way it does, or whether Flock operates as a "willful participant in joint activity with the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982).

To be sure, the district court may have also erred in assuming that Flock did not cause—and thus could not be liable for—Mr. Smith's traffic stop. The question of causation is assessed "against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Powers*, 501 F.3d at 609 (quoting *Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1968)). Courts must ask "whether it was reasonably foreseeable that the complained of harm would befall the section 1983 plaintiff as a result of the defendant's conduct." *Id.* "Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Id.* (citing cases).

But at minimum, the district court did not conduct the "necessarily fact-bound inquiry" into whether Flock's own conduct—the scanning of Mr. Smith's vehicle and alerting police dispatch of a Hot List match—could constitute state action if it did proximately cause a violation of Mr. Smith's constitutional rights. *Lugar*, 457 U.S. at 939. While questions of state action and causation may sometimes relate, "in the context of this case, the determination of proximate cause is different from the determination of state action." *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350,

6

1355 (9th Cir. 1981). "In most cases involving private defendants, there is no proximate cause issue at all. Usually, it is clear that the defendants caused the plaintiff's injury" and "[t]he issue is whether the particular conduct is purely private." *Id.* at 1356. "The case [here] presents a different problem. Here, [plaintiff's] injuries were the result of state action." *Id.* And "the question before [this Court] is whether there is any evidence that the private defendants . . . caused those acts to occur within the meaning of section[] 1983." *Id.*

Amici take no position on whether Flock's conduct caused the deprivation of Mr. Smith's constitutional rights, or whether Mr. Smith otherwise adequately pleaded constitutional claims. But if this Court ultimately agrees with the district court's analysis that Mr. Smith did not adequately allege a constitutional claim, *see* Memorandum of Opinion and Order, RE 38, Page ID ## 1012–13, then this Court need not reach the question of state action. As this Court has explained before, "there is ample precedent for a court's putting a governmental action question on the back burner while it decides whether the actions complained of would violate the Constitution assuming governmental action existed." *Ensor v. Rust Eng'g Co.*, 935 F.2d 269 (Table), 1991 WL 93188, at *4 (6th Cir. 1991) (citing cases and assessing constitutionality of drug testing program after assuming *arguendo* that enforcement of the program constitutes state action).

II.  **In assessing the state action prong of Mr. Smith's section 1983 claim, the district court substantially understated the extent of Flock's relationship with public law enforcement.**

For purposes of section 1983, a private entity's conduct constitutes state action if it is "fairly attributable to the state." *Lugar*, 457 U.S. 922 at 947. Here, the district court assessed the state action question under the "symbiotic relationship" or "nexus" test. Memorandum of Opinion and Order, RE 38, Page ID # 1011; *see Vistein v. American Registry of Radiologic Technologists*, 342 Fed. App'x 113, 127 (6th Cir. 2009) (enumerating four tests Supreme Court has established to determine whether private conduct qualifies as state action). Under the nexus test, a private entity may be liable for a constitutional violation based on "a sufficiently close nexus between the government and the private party's conduct," such that a court may fairly attribute the conduct to the state. *Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003). This is a highly fact-specific determination. *See id.*

Proving the existence or even the likelihood of such a nexus often cannot be done without discovery. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) (explaining that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance"). As such, at the stage of a motion to dismiss, a plaintiff need only plead factual allegations that, if assumed to be true, would demonstrate a right to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The plaintiff need

8

satisfy only a "plausibility" standard, not a "probability requirement" that the allegations in the complaint are *likely* to be true. *Id.* So long as a complaint contains "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support a colorable section 1983 claim, it may proceed—even if a trial judge believes the plaintiff unlikely to prevail in the end. *Id.*

In determining that Mr. Smith had not sufficiently alleged that Flock's conduct constitutes state action, the district court understated both the allegations in the complaint and the closeness of Flock's relationship with public law enforcement. The district court relied on findings that "data collected by [a Flock] camera is fully owned by" the customer and that "[n]o unauthorized users, including [Flock]'s employees, have access to the footage." Memorandum of Opinion and Order, RE 38, Page ID # 1004. The district court also found it important that Flock "does not generate the information that triggers the alert; it only matches license plate images with information already entered into the system." *Id.* at Page ID # 1005.

Yet as Mr. Smith alleged, Flock's integration with public law enforcement goes much deeper than just matching a plate image with information entered in its system. First, Flock's products are explicitly designed and marketed for law enforcement. Second, the scope of the data Flock collects is far more comprehensive and intrusive than mere snapshots of a license plate; rather, by aggregating data from both license plate readers and other police technology, Flock can serve as a full-

service, around-the-clock police surveillance system. Third, Flock enables data-sharing across law enforcement agencies to form a nationwide network, serving a critical role in police operations and creating the kind of broad surveillance apparatus typically associated only with government. Finally, Flock takes an active operational role directing the actions of patrol officers on the ground: its Hot List function sends alerts directly to police, dispatching them in real-time to the location of a flagged vehicle so that police can attempt to make a stop. Taken together, these factors demonstrate far greater entanglement with government actors than the district court acknowledged.

### A. Flock's products are specifically designed for and marketed to law enforcement.

As plaintiff alleged, Flock has designed and marketed its product suite specifically as a tool for law enforcement. Second Amended Complaint, RE 21, Page ID # 582–86, 594–611 (documenting Flock's marketing practices and promotional materials aimed at Ohio law enforcement); *see also, e.g.*, Flock Safety, *National LPR Network* (claiming Flock's network aims to help police "investigate faster, collaborate smarter and close more cases").[2]  Its software synthesizes information from not only license plate readers but also other police technology: 911 calls, computer-aided dispatch systems, police- and city-operated cameras, private

---

[2] https://www.flocksafety.com/products/national-lpr-network (last accessed July 11, 2025) (permanent link at https://perma.cc/N7JU-22QS).

cameras that feed footage to police, and law enforcement drones. Flock Safety, *Real-Time Policing*.[3] Even when Flock markets products to non-law-enforcement customers like homeowners' associations, it states that its purpose is to help those customers "provid[e] law enforcement with critical evidence." Flock Safety, *A Public Safety Technology Ecosystem*.[4]

Flock's close coordination with public law enforcement is not just marketing; it is borne out once Flock installs its cameras. *See* Second Amended Complaint, RE 21, Page ID # 606–07; 617; 625–31; 636 (describing Flock's hardware and software systems that collect and distribute data, and how those systems are deeply intertwined with law enforcement operations). Plaintiff's allegations that Flock's systems are closely integrated with law enforcement are spot on. Though customers technically own the images and plates they upload, Flock keeps control of its hardware and software. *See, e.g.*, Lars Daniel, *Privacy Violated, Warrantless Surveillance Alleges Flock Safety Camera Lawsuit*, Forbes (Oct. 22, 2024).[5] Flock maintains a license to access uploaded data, in part so that when customers opt in to its larger network, it can share that data with other police agencies. *See* Flock Safety,

---

[3] https://www.flocksafety.com/use-case/real-time-policing (last accessed July 18, 2025) (permanent link at https://perma.cc/WY9J-CSV8).

[4] https://www.flocksafety.com/ (last accessed July 18, 2025) (permanent link at https://perma.cc/WZ6N-6K9U).

[5] https://www.forbes.com/sites/larsdaniel/2024/10/22/warrantless-surveillance-federal-lawsuit-challenges-flock-safety-cameras/ (permanent link at https://perma.cc/S2NR-6MXT).

*End User License Agreement*.[6] And in Jackson Township, as elsewhere, Flock followed local police's direction about where to place cameras. Robert Wang, *Jackson Township installs 22 license plate-reading cameras*, Canton Repository (June 23, 2022)  (quoting Jackson Township Police Chief describing department's plans for camera locations).[7]

### B. Flock collects an extensive trove of information for law enforcement use.

Flock's nationwide trove of information about individuals and their driving history is much more comprehensive than any single photo of a plate. Plaintiff alleges that Flock collects and shares a "vast amount of data," including licenses plate numbers as well as other personal information that can be derived from a person's car. *See* Second Amended Complaint, RE 21, Page ID # 569. Plaintiff is right. Flock asserts its cameras capture more than *20 billion* plates every month across 49 states. Flock Safety, *National LPR Network*, *supra*. They document not just license plates but a full "Vehicle Fingerprint" extracted through machine learning: a vehicle's make, model, color, and body type; the issuing state for its plate; whether the plate is standard, temporary, or missing; damage or modifications like

---

[6] https://www.flocksafety.com/legal/terms-and-conditions-eula (last accessed July 18, 2025).

[7] www.cantonrep.com/story/news/2022/06/23/jackson-township-installs-flock-security-license-plate-reading-cameras/7568022001/ (permanent link at https://perma.cc/VM35-N6NW).

broken taillights or customized rims; and identifiers like trailers, racks, decals, window stickers, and other accessories. *See* Flock Safety, *License Plate Readers (LPR)* (listing in FAQ section examples of vehicle information cameras collect).[8] Recent reporting found that Flock has also been developing a tool to link vehicles to specific individuals—registered owners and others associated with them—using open-source, commercially available, and even hacked or leaked data. Joseph Cox, *License Plate Reader Company Flock Is Building a Massive People Lookup Tool, Leak Shows*, 404 Media (May 14, 2025).[9]

Flock thus performs broad evidence gathering that coordinates closely with and directly serves public law enforcement. Flock stores this data and makes it retroactively searchable so that police can track vehicles' movement over time. It is designed to enable law enforcement to extract weeks—even months—of the driving history of any car captured by its devices, returning by default every instance that a given car passed a Flock camera within the last month. Flock Safety, *License Plate Readers (LPR)*, *supra* (noting standard 30-day retention period for vehicle data, which may be extended to one year at customer's request, or for any other duration

---

[8] https://www.flocksafety.com/products/lpr-cameras (last accessed July 11, 2025) (permanent link at https://perma.cc/HTE9-7JWS).
[9] https://www.404media.co/license-plate-reader-company-flock-is-building-a-massive-people-lookup-tool-leak-shows/ (permanent link at https://perma.cc/8Q88-AALK).

required by state law).[10] Flock's search functions also let police query more general descriptions without a plate, such as "white sports car with a racing stripe." *Id.*[11] These features enable the kind of long-term vehicle tracking that would be infeasible through traditional means. *Cf. United States v. Jones*, 565 U.S. 400, 429 (2012) (Alito, J. concurring) (noting that digital surveillance "make[s] long-term monitoring relatively easy and cheap," while obtaining similar information via analog means "was difficult and costly and therefore rarely undertaken"). Public law enforcement is both the purpose and primary use of such extensive surveillance, and

---

[10] Of the states that have laws regulating the storage of license plate reader data, several permit agencies to retain data for longer than 30 days, including in many cases indefinite retention for an open law enforcement investigation or prosecution. *See, e.g.,* Cal. Veh. Code § 2413(b) (2011) (permitting retention of license plate data for up to 60 days, or longer if used as evidence or in a felony investigation); Ga. Code Ann. § 35-1-22(b) (2024) (permitting storage of license plate data for up to 30 months, or longer if retained for a law enforcement purpose); Tenn. Code Ann. § 55-10-302(b) (2014) (permitting retention of license plate reader data for up to 90 days unless retained for an ongoing investigation, in which case it may be stored longer). Tennessee, notably, requires license plate data to be deleted upon completion of an investigation that does not result in charges—precisely what the Cleveland Police Department failed to do here. Tenn. Code Ann. § 55-10-302(b)(1) (2014).

[11] Similar systems from Flock's competitors are known to capture—and let police search—text other than license plates, including text on decals and bumper stickers that can reveal political or religious affiliations. Matt Burgess & Dhruv Mehrotra, *License Plate Readers Are Creating a US-Wide Database of More than Just Cars*, WIRED (Oct. 3, 2024), https://www.wired.com/story/license-plate-readers-political-signs-bumper-stickers/. While it is not apparent from the allegations here that Flock enables such searches, the possibility that it could do so raises not just Fourth Amendment but also First Amendment concerns.

the comprehensive nature of Flock's surveillance makes it a full-service system, regularly facilitating police investigations and operations.

**C.  In its platform for cross-agency data-sharing, Flock operates a national law enforcement database akin to similar federal databases.**

Flock's ability to automate data-sharing across thousands of law enforcement agencies—as alleged by plaintiff, *see* Second Amended Complaint, RE 21, Page ID # 575–76; 606–07—more closely resembles federal law enforcement conduct than that of smaller and more local police contractors. Flock's data-sharing network lets public police agencies access an exponentially vaster trove of information about individuals' driving history than they could through other methods or if they were limited to viewing only their own data. Flock specifically advertises that its cameras and search interface tap into a network of over 5,000 law enforcement agencies. Flock Safety, *License Plate Readers (LPR)*, *supra*. As plaintiff alleged*, see* Second Amended Complaint, RE 21, Page ID # 582–84, Flock aggregates data not only from local police departments but also from several statewide databases and national law enforcement databases like the National Crime Information Center and Federal Bureau of Investigation hotlists. Flock Safety, *National LPR Network*, *supra*. It is precisely this data-sharing capacity that led to plaintiff's traffic stop here.

The only analogues to such a vast repository of potentially sensitive, readily searchable personal information are databases run *by* federal law enforcement itself, such as the FBI-run databases for fingerprints and DNA. *See, e.g.*, Bureau of Just.

15

Stat., *Integrated Automated Fingerprint Identification System (IAFIS)* ("IAFIS provides automated fingerprint search capabilities, latent searching capability, electronic image storage, and electronic exchange of fingerprints and responses"—functions similar those Flock offers for "vehicle fingerprints");[12] Bureau of Just. Stat., *CODIS* (identifying the Combined DNA Index System, or CODIS, as a "software program that operates local, state, and national databases of DNA profiles" from criminal and missing persons cases).[13] Yet unlike those databases, a person need not be linked to a criminal or law enforcement matter to be included, via their vehicle, in Flock's system. Flock documents virtually *all* vehicles that pass by its cameras, whether they are listed as suspicious or not.

Courts have begun to take notice of the constitutional problems Flock's products produce. *See, e.g.*, *Commonwealth v. Bell*, 113 Va. Cir. 316, 2024 WL 5516362, at *2–*3 (Va. Cir. Ct. May 10, 2024) (unpublished) (determining Flock's collection of vehicle plate and location data to be "a search within the meaning of the Fourth Amendment" based on breadth of camera coverage and data storage).  At least one federal court has found that a dense enough network of Flock cameras plausibly constitutes "a drag-net system of surveillance that effectively tracks the whole of [drivers'] physical movements." *Schmidt v. City of Norfolk*, No. 2:24-CV-

---

[12] https://bjs.ojp.gov/glossary/integrated-automated-fingerprint-identification-system-iafis (last accessed July 17, 2025).

[13] https://bjs.ojp.gov/glossary/codis (last accessed July 17, 2025).

621, 2025 WL 410080, at *6 (E.D. Va. Feb. 5, 2025); *cf. Carpenter v. United States*, 585 U.S. 296, 310 (2018) (holding that "individuals have a reasonable expectation of privacy in the whole of their physical movements," and indicating that one factor in whether location data implicates the Fourth Amendment is the ease with which police can, "[w]ith just the click of a button," obtain a "deep repository of historical location information").

In *Schmidt*, plaintiffs challenged the deployment of 172 Flock cameras across Norfolk, Virginia, and the aggregation of Norfolk's Flock data with that of neighboring cities. *Schmidt*, No. 2:24-CV-621, 2025 WL 410080, at *1. The court there denied Norfolk's motion to dismiss under Rule 12(b)(6), concluding that the complaint plausibly set forth a Fourth Amendment violation for purposes of section 1983. *Id.* at *8.[14] The court pointed to Norfolk's police chief's acknowledgment that

---

[14] It is noteworthy with respect to the state action question here that in *Schmidt*, Flock has sought to coordinate closely with the municipality not just on law enforcement but on the litigation itself. First, Flock sought to intervene, even though plaintiffs had only sued municipal defendants and had not named it as a party. *See* Opinion and Order at 3, *Schmidt v. City of Norfolk*, No. 2:24-CV-621 (E.D. Va. May 27, 2025), ECF No. 66. The district court denied that motion, determining first that it was untimely, and second that Flock was so closely aligned with the government defendants that the government defendants could adequately represent Flock's interests. *Id.* at 13, 19–21. In response, Flock had its own counsel enter appearances *pro hac vice*—on behalf of the municipal defendants. *Application to Qualify as a Foreign Attorney Under Local Civil Rule 83.1(E) and Local Criminal Rule 57.4(E)*, *Schmidt v. City of Norfolk*, No. 2:24-CV-621 (E.D. Va. June 4, 2025), ECF No. 72; *Application to Qualify as a Foreign Attorney Under Local Civil Rule 83.1(E) and Local Criminal Rule 57.4(E)*, *Schmidt v. City of Norfolk*, No. 2:24-CV-621 (E.D. Va. June 4, 2025), ECF No. 73.

residents would find it "difficult to drive anywhere of any distance [in Norfolk] without running into a camera." *Id.* at *1. Additionally, Flock's contract with Norfolk listed the purpose of the cameras as crime prevention and prosecution, police investigations, and evidence gathering—all explicit public law enforcement functions. *Id.* While that case did not directly address the question of state action, the court's findings reflect the close nexus between Flock and the police department.

### D. Flock actively directs police operations on the streets and is functionally indistinguishable from traditional police dispatch or real-time text and radio bulletins.

Flock is not just a massive surveillance database built and operated for law enforcement; it also plays an active operational role in on-the-ground policing. As Plaintiff has alleged in detail, Flock dispatches police in real time to locations where a hotlisted vehicle has been spotted. Plaintiff's complaint focuses significant attention on this aspect of Flock's service. *See* Second Amended Complaint, RE 21, Page ID # 583–86; 606–07. For example, the complaint includes a screenshot from Flock promotional materials touting Flock's "Hot List alerts, which notify law enforcement when a known suspect's vehicle is in the area." *Id.* at Page ID # 585.

Flock's Hot List notification system is functionally indistinguishable from traditional police dispatch systems that communicate real-time notifications or bulletins to patrol officers by text or radio. As the complaint documents, Flock advertises: "When a vehicle with a warrant of a stolen vehicle passes a camera,

officers receive a notification enabling them to respond accordingly, and prevent the suspect from committing any further crimes." *Id.* These "Hot List alerts" depend upon Flock's direct access to confidential law enforcement databases that list suspect vehicles. As Flock explains, "These real-time notifications connect Flock cameras with data from the [FBI] National Crime Information Center and local law enforcement agencies." *Id.*

There could hardly be a closer nexus between a private company and the police. Flock has direct access to confidential law enforcement databases; it uses that information to identify suspect vehicles in real time; and it sends alerts directly to officers on the streets so that they can spot the vehicle, effectuate a stop, and make an arrest in real time. This is functionally indistinguishable from the work of traditional police dispatchers or real-time crime centers.

Taken together, Flock's law-enforcement-focused product design, comprehensive data collection and retroactive searchability, nationwide scope, and operational integration in day-to-day policing reflect a profound entwinement with public law enforcement. The proliferation of surveillance technology companies like Flock, which build tools designed for law enforcement and contract mainly with police departments, demands extra vigilance from courts: the constitutional concerns that the Supreme Court identified in cases like *Carpenter* and *Jones* only deepen when state institutions launder those surveillance functions through private entities.

19

Yet the district court's narrow application of the nexus test failed to take account of this ever-deepening entanglement or the constitutional risks it poses. If this Court reaches the question of state action, amici urge this Court not to make the same error.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court (1) not to conflate, as the district court did, the question of causation with the question of state action, and (2) if reaching the question of state action, to take thorough account of the depth and breadth of Flock's intertwinement with public law enforcement and the full factual allegations regarding this issue in Mr. Smith's complaint.

Dated: July 30, 2025                    Respectfully Submitted,

                                        *s/ Ellen Noble*

MAITHREYI NANDAGOPALAN          ELLEN NOBLE
Innocence Project, Inc.         Roderick & Solange
40 Worth Street, Suite 701      MacArthur Justice Center
New York, NY 10013              501 H Street NW, Suite 275
(212) 364-5340                  Washington, DC 20002
mnandagopalan@innocenceproject.org  (202) 869-3439
                                ellen.noble@macarthurjustice.org

                                JONATHAN MANES
                                Roderick & Solange
                                MacArthur Justice Center
                                160 E. Grand Avenue, 6th Floor
                                Chicago, IL 60611
                                (312) 503-0012
                                jonathan.manes@macarthurjustice.org

                    *Counsel for Amici Curiae*

# <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because it contains 4,787 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 and Times New Roman 14-point font.

Dated: July 30, 2025                      Respectfully submitted,

                                          *s/ Ellen Noble*_____
                                          Ellen Noble

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system, and a copy was served by U.S. Mail, postage prepaid, on the following:

Michael Smith
1225 Skyline Drive, Apt. 105
Orrville, OH 44667

Dated: July 30, 2025                              Respectfully submitted,

                                                 *s/ Ellen Noble*
                                                 Ellen Noble